# In the United States Court of Federal Claims

No. 25-685
(Filed under seal: August 12, 2025)
(Reissued for Publication: September 16, 2025)[1]

```
*****************************************
AMERICAN TECH SOLUTIONS, LLC,           *
                                        *
                Plaintiff,              *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
                Defendant,              *
                                        *
and                                     *
                                        *
KNIGHT FEDERAL SOLUTIONS, INC.,         *
                                        *
                Defendant-Intervenor.   *
*****************************************
```

*David B. Dempsey*, Dempsey Law, PLLC, Vienna, VA, counsel for Plaintiff. With whom was *Ian Cronogue*, Baker, Cronogue, Tolle & Werfel, LLP, McLean, VA, of counsel.

*Collin T. Mathias*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Major Joshua A. Reyes*, Trial Attorney, United States Army Legal Services Agency, of counsel.

*Joseph M. Goldstein*, Shutts & Bowen LLP, Fort Lauderdale, FL, counsel for Defendant-Intervenor.

## OPINION AND ORDER

**DIETZ, Judge.**

American Tech Solutions, LLC ("ATS") protests a decision by the United States Department of the Army ("Army") to award a contract for information technology support services to Knight Federal Solutions, Inc. ("KFS"). ATS alleges that the Army made an improper award decision because KFS failed to meet the requirements of the solicitation and was therefore ineligible for award. ATS further alleges that the Army conducted an improper technical

---

[1] This Opinion and Order was filed under seal on August 12, 2025, *see* [ECF 55], in accordance with the Protective Order entered on April 29, 2025, *see* [ECF 19]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on September 4, 2025, with agreed upon proposed redactions. [ECF 59]. The Court accepts all proposed redactions.

evaluation of KFS's technical proposal. For the reasons set forth below, the Court finds that the Army's evaluation and award decision were reasonable and consistent with the solicitation criteria. Accordingly, ATS's motion for judgment on the administrative record is **DENIED**, and the government's and KFS's respective cross-motions are **GRANTED**.

### I. BACKGROUND

The Joint Readiness Training Center ("JRTC") in Fort Johnson, Louisiana, provides the United States military with "relevant, rigorous, multi-echelon training . . . to develop adaptive leaders, confident units, and robust capabilities across the range of military operations achieving Army readiness." AR 395.[2] On August 22, 2023, the Army issued a Request for Quote ("RFQ") for JRTC Mission Support Services ("MSS") using the ordering procedures for Federal Supply Schedules under Federal Acquisition Regulation ("FAR") subpart 8.405. AR 210.[3] The Army intended "to award a Small Business (SB) Set-Aside Order under [the] General Services Administration . . . Information Technology Professional Services Multiple Award Schedule . . . for JRTC MSS requirements identified under [a] . . . Performance Work Statement (PWS)." *Id.* The RFQ contemplated a fixed price order consisting of a seven-month base period, four twelve-month option years, and a six-month option to extend services. AR 348.

Additionally, the RFQ stated that "[the] competitive source selection will be conducted using the Best Value Subjective Trade Off source selection process." AR 388. The two evaluation factors were identified as "Factor 1: Technical," and "Factor 2: Price." *Id.* The RFQ explained that the technical factor was "significantly more important" than price but that "the award may not necessarily be made to the lowest priced offer[or] or the highest technically rated offeror." *Id.* The RFQ cautioned offerors "that while the [Army] will not evaluate every PWS requirement for the purposes of the source selection evaluation, the awardee will be required to comply with all of the PWS requirements during task order performance." *Id.* It further instructed that "the Offeror's submission must convey to the [Army] that the Offeror is capable, possesses adequate technical expertise and experience, sufficient resources, and has the ability to plan, organize, and utilize those resources in a coordinated and timely fashion to meet the requirements of the . . . PWS." *Id.* The solicitation outlined the "overarching evaluation approach" as follows:

> a. <u>Adequacy of Response.</u> The submission will be evaluated to determine whether the offeror's methods and approach have adequately and completely considered, defined, and satisfied the requirements specified in the RFQ. The submission will be evaluated to determine the extent to which each requirement has been addressed in the submission in accordance with the submission section of the RFQ.

---

[2] The Court cites to the Administrative Record filed by the government on May 7, 2025, *see* [ECF 23], and made available to the parties electronically as "AR__."

[3] The RFQ issued on August 22, 2023, was amended following a question-and-answer period that concluded on August 29, 2023. AR 1204-05.

> b. <u>Feasibility of Approach.</u> The submission will be evaluated to determine the extent to which the proposed approach is workable and the end results achievable. The submission will be evaluated to determine the extent to which successful performance is contingent upon proven devices and techniques. The submission will be evaluated to determine the extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule.

AR 389.

Regarding the technical factor, the RFQ stated that "[t]he [Army] will evaluate the contractor's proposed plan to fulfill the requirements specified in the PWS, noting its associated merits and risks." AR 389. The RFQ defined a merit as "[a]n offeror[']s approach that provides the [Army] additional benefits that exceed the . . . requirement," and defined a risk as "[a]n offeror[']s approach that increases the probability of contract performance failure." *Id.* Based on the technical evaluation, the Army would assign one of the following three ratings:

| Technical Ratings | |
|---|---|
| **Adjectival Rating** | **Definition** |
| Good | Proposal meets requirements and indicates a superior approach. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach. Risk of unsuccessful performance is no worse than moderate. |
| Unacceptable | Proposal does not meet requirements. |

*Id.* Regarding the price factor, the RFQ stated that "the [Army] will evaluate the fixed price effort for reasonableness by conducting a price analysis." AR 390. It further explained that the "Total Evaluated Price (TEP) will be the offerors' proposed firm fixed priced effort and the Government provided cost (No Fee) estimate included in [the] . . . Cost/Price Workbook." *Id.* The RFQ stated that "[t]he base program and all options will be included in the TEP for both evaluation and award purposes." *Id.*

The Army received a total of seven offers, including the offers from ATS and KFS. AR 1207, 1587. KFS is listed as offeror B, and ATS is listed as offeror C. AR 1205. The technical evaluation team conducted an evaluation of each offeror's technical proposal and "developed a consensus technical evaluation for each offeror," identifying applicable merits and risks. AR 1206. ATS and KFS each received a "Good" rating. AR 1207. ATS received four merits and no risks. AR 1211-14. The evaluators concluded that ATS's "technical proposal meets requirements and indicates a **Superior** approach, and [that] the risk of unsuccessful performance is low." AR 1211. KFS received three merits and no risks. AR 1208-11. The evaluators similarly determined that KFS's "technical proposal meets requirements and includes merits which indicate a **Superior** approach, and [that] the risk of unsuccessful performance is low." AR 1208.

The price evaluation team conducted an evaluation of each offeror's price proposal for reasonableness. AR 1221. The price evaluation did not result in an adjectival rating. *Id.* Since the planned order consisted of "a combination of firm fixed price [Contract Line Item Numbers ("CLINS")] and cost type CLINS," the evaluators "add[ed] the Contractor proposed Firm Fixed

3

Price CLINs and Government provided Cost CLIN amounts, to include priced option years CLINs" to compute the TEP. *Id.* The price evaluation "presumed adequate price competition would be achieved," which was affirmed by the price evaluator based on the receipt of seven proposals. *Id.* The evaluator also utilized an Independent Government Estimate ("IGE"), included with the RFQ, for comparison purposes. AR 1222. All offers were determined to have fair and reasonable pricing. AR 1226-27. ATS quoted a TEP of $22,248,200.82, and KFS quoted a TEP of $21,393,822.04—a difference of $854,378.78. AR 1222; 1232. ATS was 15% higher than the IGE, KFS was 12% higher than the IGE. AR 1222. Neither ATS nor KFS was the lowest priced offeror. *Id.*

Based on the technical and price evaluations, the Source Selection Authority ("SSA") conducted a comparative analysis. AR 1226-32. The SSA summarized the evaluation results in the below table:

Evaluation Roll-Up Table

| Offeror | Factor 1 Technical | Factor 2 Price | Price Fair & Reasonable*** |
|---|---|---|---|
| Offeror A | Acceptable | ■ | Yes |
| Offeror B | Good | $ 21,393,822.04 | Yes |
| Offeror C | Good | $ 22,248,200.82 | Yes |
| Offeror D | Acceptable | ■ | Yes |
| Offeror E | Acceptable | ■ | Yes |
| Offeror F | Acceptable | ■ | Yes |
| Offeror G | Acceptable | ■ | Yes |

AR 1227. The SSA determined that each of the offeror's proposals was eligible and warranted further evaluation. AR 1227. Based on a best-value trade-off analysis, the SSA eliminated offerors A, D, E, F, and G. AR 1228-29.[4] The SSA then summarized "the individual proposed technical solution[s] and respective merits and risks identified" in KFS's and ATS's proposals. AR 1229. The SSA stated that "[b]oth [KFS] and [ATS] provided a superior staffing approach, with [ATS] providing [a] slightly better recruitment and retention solution than that of [KFS]" but that "[b]oth Offerors provided detailed staffing approaches, which provide[d] the [Army] confidence that each fully underst[ood] the requirement and propose[d] solutions[,] which greatly reduce the risk to unsuccessful contract performance." AR 1232. The SSA concluded that, while "[b]oth [KFS] and [ATS] propose[d] detailed Staffing approaches, multiple merits, often meeting, and in some instances exceeding the [Army's] requirements[,] . . . [ATS's] proposal would come at a premium of $854,378.78 over [KFS's] proposed price, and the [Army] d[id] not consider the premium justified." *Id.* The Army issued the award to KFS on September 28, 2023, AR 1233, and thereafter notified ATS that it was not selected, AR 1363.

On October 11, 2023, ATS filed a bid protest with the Government Accountability Office ("GAO"). *Am. Tech Sols., LLC*, B-422119.1 (2023); AR 1369. However, ATS withdrew this

---

[4] Offeror A was eliminated due to a risk assigned for unexplained pricing for option year 4, AR 1228, and offerors D, E, F, and G were eliminated due to their "less superior, less meritorious Staffing Plan[s]" and higher pricing than KFS and ATS, AR 1229.

4

protest after the government moved to dismiss it as premature because debriefing by the Army had not been completed. *Am. Tech Sols., LLC*, B-422119.1 (2023); AR 1385-86. ATS filed another bid protest with the GAO on November 20, 2023, after the Army completed final debriefing. *Am. Tech Sols., LLC*, B-421585.6 (2023); AR 1430. In its protest, ATS alleged that the Army failed to properly evaluate the technical and price proposals of ATS and KFS and failed to properly document its source selection decision. AR 1448-49. On February 27, 2024, the GAO denied ATS's protest. *Am. Tech Sols., LLC*, B-422212.2 at 3 (2024); AR 2020. The GAO concluded that "the [Army] adequately documented the rationale for the award decision and the record otherwise demonstrates that the decision is reasonable." *Am. Tech Sols., LLC*, B-422212.2 at 9 (2024); AR 2028.

Nearly one year later, on January 8, 2025, ATS filed a bid protest in this Court. *Am. Tech Sols., LLC v. United States*, 176 Fed. Cl. 445, 447 (2025). This initial protest was dismissed without prejudice on May 21, 2025, for failure to prosecute under Rule 41(b) of the Rules of the United States Court of Federal Claims ("RCFC"). *Id*. at 450. Thereafter, on April 23, 2025, ATS filed the instant protest. Compl. [ECF 1].[5] The Court issued a scheduling order on May 6, 2025, establishing a briefing schedule for cross-motions for judgment on the administrative record ("MJAR"). [ECF 22]. On May 7, 2025, the government produced the Administrative Record. AR [ECF 23]. On May 14, 2025, ATS filed two motions to supplement the administrative record, Pl.'s First Mot. Compel [ECF 28]; Pl.'s Second Mot. Compel [ECF 29], both of which the Court denied on May 28, 2025, Order [ECF 34]. ATS filed its MJAR on June 9, 2025. [ECF 38]. The government and KFS each filed a response to ATS's MJAR and a cross-MJAR on June 26, 2025. [ECFs 42, 44]. KFS also filed a motion to complete the administrative record on June 26, 2025, [ECF 43], which KFS amended on June 27, 2025, [ECF 45]. On July 4, 2025, a day after the applicable filing deadline, ATS filed its reply and response to the government's and KFS's MJARs. [ECF 48]. On July 11, 2025, ATS moved for leave to file its reply and response out of time. [ECF 51]. On July 14, 2025, the government filed its reply in support of its cross-MJAR. [ECF 52]. KFS filed a notice in support of the government's reply brief on July 15, 2025. [ECF 53]. The Court held oral argument on the cross-MJARs on July 24, 2025. *See* [ECF 22].

## II.   LEGAL STANDARDS

The Tucker Act grants this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act's waiver of sovereign immunity "covers a broad range of potential disputes arising during the course of the procurement process," including "objections to an award." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).

Under Rule 52.1 of the Rules of the United States Court of Federal Claims, a party may file an MJAR to assess whether a federal agency acted in accordance with the legal standards governing the decision under review. *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019), *aff'd*, 959 F.3d 1379 (Fed. Cir. 2020). This motion "is often an appropriate vehicle to scrutinize an agency's procurement actions because such cases typically involve interpretation of

---

[5] On June 12, 2025, ATS filed a motion to amend its complaint, [ECF 39], which the Court granted on June 24, 2025, [ECF 40]. ATS filed an amended complaint on June 25, 2025. [ECF 41].

contract documents or regulations, thereby presenting no disputed issues of material fact." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (citing *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000)). "On such a motion, the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record." *KPMG LLP v. United States*, 166 Fed. Cl. 588, 595 (2023) (citing RCFC 52.1; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005)). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum*, 404 F.3d at 1356).

This Court reviews agency decisions in bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). This standard permits a court to set aside an agency's procurement decision if the protestor shows that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bannum*, 404 F.3d at 1351. "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency[] but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332-33 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). While the APA standard calls for considerable deference to the agency, *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010), "it is not a rubber stamp," *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 742 (2000) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n,* 59 F.3d 284, 290 (1st Cir. 1995)). A court may set aside an agency's procurement decision if the decision lacked a rational basis, or the procurement procedure involved a violation of regulation. *Impresa*, 238 F.3d at 1332; *see also Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021). Nevertheless, if the reviewing court finds that the agency's action evinced rational reasoning and consideration of relevant factors, it must sustain it. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

The protestor has the burden to show that the agency decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Glenn Def. Marine*, 720 F.3d at 907. The protestor must also show that the agency's error was prejudicial. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) (citing *Shinseki v. Sanders*, 556 U.S. 396 (2009)). To establish prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

6

### III.    ANALYSIS

ATS challenges the Army's award decision on three grounds. First, ATS argues that the Army should have found that KFS was ineligible for award because KFS failed to provide Contractor Acquired Property ("CAP")[6] and technical refresh costs in its price proposal. [ECF 38] at 11.[7] Second, ATS argues that the Army improperly altered the direct labor hours in KFS's price proposal. *Id*. at 17. Third, ATS argues that "[t]he Army's technical evaluation was not conducted in accordance with the RFQ requirements[,] and [that] the decisions reached were not properly documented as required by law." *Id*. at 22. As explained below, the Court finds that the RFQ did not require KFS to separately price CAP and technical refresh costs to be eligible for award; that the Army's error in evaluating KFS's proposed labor hours was nonprejudicial; and that the Army's technical evaluation was rational.

### A.    The RFQ Did Not Require Separately Priced CAP Costs

ATS asserts that the Army should have found KFS ineligible for award because KFS failed to submit a responsive proposal. [ECF 38] at 11. ATS contends that "CAP and Tech Refresh costs are material terms of the RFQ which were not addressed in KFS's Price Proposal." *Id*. According to ATS, the unambiguous text of CLIN X009 of the RFQ required KFS to identify its CAP costs as part of its Program Management price under CLIN X001. *Id*. at 11-12. ATS contends that it "specifically identified CAP costs (and Tech Refresh) costs in its Program Management price," and that "KFS specifically did not." *Id*. at 12. In response, the government contends that the RFQ did not require KFS to provide specific CAP costs in the price proposal. [ECF 42] at 19. The government asserts that "ATS misunderstands the solicitation's terms and requirements," *id*. at 20, and that, under the plain language of the RFQ, "[t]here was no need for KFS to specifically list and estimate CAP expenses," *id*. at 21. The government posits that "KFS complied with the solicitation" because "the plain language specifically stated that CAP should not be separately priced." *Id*. Regardless, the government states that "the Army did not penalize ATS for the additional detail," *id*., and that the Army properly evaluated each offeror's total proposed prices, including any embedded CAP, *id*. The government states that "ATS does not demonstrate any prejudice from KFS not specifically listing all CAP costs" because this is a fixed price contract, which means that the Army only pays KFS its proposed price, "[e]ven if KFS had underestimated CAP expenses." *Id*. at 22.

The Court finds that the RFQ did not require KFS to separately price CAP costs to be eligible for award and that the Army's price evaluation was rational. Under CLIN X009, offerors were instructed as follows:

> Deliver all Contractor Acquired Property (CAP) for use in the execution and management of all services IAW JRTC-PWS-01. All costs associated with CAP shall be included in the Program Management section. Not Separately Priced (NSP).

---

[6] CAP is defined as "property acquired, fabricated, or otherwise provided by the contractor for performing a contract and to which the Government has title." FAR §§ 45.101; 52.245-1.

[7] All page numbers in the parties' briefs refer to the page numbers generated by the CM/ECF system.

7

AR 351. The placeholder for the proposed dollar amount for CLIN X009 also states "Not Separately Priced." *Id.* The reference to the "Program Management section" in CLIN X009 refers to the CLIN for Program Management, CLIN X001. *See* AR 349.

To advance their positions, the parties rely on different interpretations of CLIN X009. ATS relies on the portion of CLIN X009 that states "[a]ll costs associated with CAP shall be included in the Program Management section" to argue that CAP costs "must still be identified and included in an offeror's Program Management section." [ECF 38] at 14-15 (emphasis omitted). ATS also alludes to the fact that KFS's pricing workbook submitted with its proposal included CAP costs as a line item but that the CAP costs line item did not provide a dollar amount. *Id*. at 16. Because KFS failed to include a specific dollar amount for CAP costs, ATS contends that KFS's proposal was nonresponsive. *Id.* at 16-17. In contrast, the government relies on the portion of CLIN X009 which provides that CAP costs be "Not Separately Priced" to argue that CAP costs did not need to be identified as a separately priced element. [ECF 44] at 10. The government maintains that "nothing in the RFQ required that level of granularity, nor did the solicitation obligate the [Army] to conduct a line-by-line verification of embedded cost elements in fixed-price proposals." *Id*. at 10-11.

The Court finds that these differing interpretations are not mutually exclusive. The correct interpretation of a solicitation is a question of law. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1577 (Fed. Cir. 1994); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985)). The Court begins with the plain language of the document. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc). "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; [the court] may not resort to extrinsic evidence to interpret them." *Banknote Corp. of Am.*, 365 F.3d at 1351 (citing *Coast Fed. Bank*, 323 F.3d at 1038). The plain language of CLIN X009 unambiguously states that CAP costs are not to be separately priced under the distinct CLIN X009 and that all CAP costs are to be included under CLIN X001—the Program Management section. CLIN X001 required a single firm-fixed price for the offeror to "successfully integrate and coordinate all activity needed to execute the [PWS] requirements." AR 349. Thus, the RFQ required that offerors include any proposed CAP costs as part of their proposed price for Program Management under CLIN X001. However, the RFQ did not require that offerors specifically identify such costs under CLIN X001 as separately priced elements. Because the RFQ did not require offerors to separately price CAP costs under CLIN X001, the Army did not err when it treated KFS's proposal as responsive and eligible for award despite KFS's failure to do so.

Furthermore, the Army did not act arbitrarily or capriciously in conducting its price evaluation. The RFQ stated that the Army would evaluate price reasonableness "by conducting a price analysis." AR 390. Under FAR 15.404-1(b)(1), price analysis is defined as "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." In addition, the government "may use various price analysis techniques and procedures to ensure a fair and reasonable price," FAR 15.404-1(b)(2), including the "[c]omparison of proposed prices received in response to the solicitation," FAR 15.404-

1(b)(2)(i). The comparison of proposed prices is a preferred technique. FAR 15.404-1(b)(3). Also, "adequate price competition" will normally establish a fair and reasonable price. FAR 15.404-1(b)(2)(i). In evaluating the adequacy of price competition, the FAR provides that:

> A price is based on adequate price competition when—
>
> (A) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement;
>
> (B) Award will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection; and
>
> (C) There is no finding that the price of the otherwise successful offeror is unreasonable. Any finding that the price is unreasonable must be supported by a statement of the facts and approved at a level above the contracting officer.

FAR 15.403-1(c)(1)(i)(A)-(C). The SSA determined that price competition was established based on the receipt of seven price proposals. AR 1221. Having determined that KFS and ATS would provide "superior" technical capabilities over the other offerors, AR 1227, the Army hinged its award decision on a comparison of their respective price proposals, AR 1232. The Army concluded that "[ATS's] proposal would come at a sizeable premium of $854,378.78, for a closely similar solution, which cannot be justified." *Id*.

      This conclusion has a rational basis and is consistent with the RFQ terms. While KFS's proposal did not contain a separate price for CAP costs like ATS's proposal, both proposals provided a total firm fixed price for "[t]he base program and all options." AR 390. This total price included satisfaction of *all* PWS requirements during task order performance. AR 388 (noting that the Army "will not evaluate every PWS requirement for the purposes of the source selection evaluation [but that] the awardee will be required to comply with all of the PWS requirements during task order performance"); *id.* (stating that "[t]he Offeror's submission must convey to the Government that the Offeror is capable, possesses adequate technical expertise and experience, sufficient resources, and has the ability to plan, organize, and utilize those resources in a coordinated and timely fashion in order to meet the requirements of the . . . PWS"). Therefore, the Army was justified in directly comparing the total prices proposed by ATS and KFS. Moreover, the SSA determined that KFS's proposal represented the best value to the Army, given the technical equivalence of KFS's and ATS's respective proposals and the higher price quoted by ATS. AR 1231 (stating that KFS's proposal "represents the best value to the Government with appropriate consideration given to the two evaluation factors and their relevant order of importance"). Finally, the record does not contain any finding, by the SSA or otherwise, that KFS's proposed price was unreasonable. *See* AR 1226 (the Source Selection Memorandum stating that all offerors "provided proposals conforming to the RFQ requirements, with pricing that is fair and reasonable"). Because the Army's evaluation and award decision adhered to the terms of the RFQ, complied with the applicable FAR requirements, and had a rational basis, the

Court defers to the Army's best value determination. *See First Enter. v. United States*, 61 Fed. Cl. 109, 122 (2004) (citing *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996)) (stating that "the court must accord broad deference to a contracting officer's decision as to which proposal in a negotiated procurement represents the best value").

ATS argues that the Army "did not calculate [KFS's] Total Evaluated Price as the [Army] was obligated to calculate" under the RFQ, [ECF 38] at 15, because KFS's pricing workbook "focused exclusively on labor costs" and failed to account for the CAP that was required to meet the PWS requirements, *id.* at 13. In support of its position, ATS states that the IGE prepared by the Army in relation to the RFQ "included CAP costs estimated at $668,571.30 for [Other Direct Costs ("ODCs")] as a 'Baseline' . . . and $802,286.16 as the 20% 'Estimate Sensitivity Analysis.'" *Id.* at 16 n.13. ATS argues that "[t]hese ODC or CAP costs . . . are too large to omit by KFS in its Price Proposal (and satisfy the specific RFQ requirements listed above) and too large to ignore by the [Army] when compared to the incumbent ATS cost estimates." *Id.* In essence, ATS argues that the Army conducted an arbitrary price evaluation by not acknowledging that ATS included CAP costs in its pricing and KFS did not. *See id.* at 13-17. The Court is ultimately not persuaded by this argument. The RFQ does not specify what CAP is required to satisfy the PWS requirements. *See generally* AR 348-90. Instead, the RFQ permitted each offeror to identify CAP under CLIN X001 to the extent that the offeror determined that such CAP was necessary to meet the PWS requirements and warranted reimbursement. That ATS opted to include CAP costs in its proposed price and KFS opted to omit CAP costs does not render the Army's price evaluation arbitrary. As explained in the RFQ, the total firm fixed prices to be proposed by the offerors and evaluated by the Army accounted for full satisfaction of *all* PWS requirements during the base year and all option years. *See* AR 390. As such, the Army's comparison of such prices, without considering the individual elements under each offeror's price, was rational. *See Price Gordon Servs. v. United States*, 139 Fed. Cl. 27, 59-60 (2018) (holding that the agency properly conducted a price analysis by comparison of proposed prices); *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 564 (2017) (holding that the agency was not required to perform a price realism analysis in a firm fixed price procurement because it was not required by the solicitation).[8]

### B.   The Army's Error in Evaluating KFS's Labor Hours Did Not Prejudice ATS

ATS alleges that the Army price evaluator "improperly and without authority added approximately 29,120 direct labor hours to the KFS Price Proposal." [ECF 38] at 17. ATS also contends that the resulting labor hours table included "erroneously calculated" labor hours, and that the "[l]abor hours table provide[d] KFS [with] a significant advantage [because] the technical evaluators were given a false reason to believe that KFS [proposed the] direct labor hours to perform when in fact KFS did not." *Id.* at 20-21. In response, the government concedes that the Army price evaluator made "an administrative error" in evaluating KFS's labor hours. [ECF 42] at 24. However, the government explains that the price evaluator "made the

---

[8] While not determinative of this issue, the Court notes that ATS was the only offeror to explicitly include CAP and technical refresh costs in its proposed pricing. *See generally* AR Tabs 35, 51, 55, 59, 64 (other offeror pricing workbooks). Additionally, the estimate for the ODCs in the IGE related only to the cost of "4x4 pick up trucks." AR Tab 135 (Enhanced Debriefing Questions and Responses). The IGE did not identify specific CAP or technical refresh costs for offerors to include in their proposals.

modification based on [a] misunderstanding, adjusting the [labor] hours only," *id.* at 25, and that "this error was not prejudicial," *id.* The government contends that "the adjustment to the proposed labor hours did not change KFS's total price" and that "the administrative error did not prejudice ATS in the technical evaluation." *Id.* at 26. According to the government, the record makes clear that "[t]his administrative error had no impact on ATS's chance of award." *Id.* at 25.

Because the Army concedes that it erred in its evaluation of KFS's labor hours, the Court must assess whether the error resulted in prejudice to ATS. "[T]o prevail in a protest[,] the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (collecting cases). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Id.* Instead, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval Separation*, 175 F.3d at 1367 (quoting *Statistica*, 102 F.3d at 1582).

KFS's proposed pricing workbook was based on an estimate of ▮ labor hours per full-time employee ("FTE") during the option years. *See* AR Tab 42 (KFS's pricing workbook); *see also* AR 2069 (Army's reference to KFS's pricing workbook). During the evaluation, the Army increased KFS's labor hour estimate per FTE from ▮ hours to ▮ hours. *See* AR 1171-72 (Army's price evaluation report); *see also* AR 2069 (Army's reference to price evaluation report). As a result of this alteration, the price evaluation report and source selection memorandum incorrectly portrayed KFS's total proposed labor hours as ▮ rather than ▮. *Compare* AR 1171-72, 1223 *with* AR Tab 42, AR 2069.

Before ATS filed its first complaint in this Court, the Army conducted an independent review of ATS's claims based on a draft version of its complaint. AR 2064. In its review, the Army acknowledged that "[t]he cost evaluator's decision to adjust the proposed labor hours without seeking clarification was procedurally improper." AR 2071. The Army explained the error by stating that:

> [KFS's] pricing narrative indicated a basis of estimate of ▮ hours per FTE; however, their price workbook reflected ▮ hours per FTE. The cost evaluator unilaterally updated the total proposed labor hours to align with the ▮ hours per FTE as stated in the pricing narrative. The adjusted hours were provided to the technical evaluation team, which used them in their analysis of the awardee's proposal.
>
> No other Offerors' labor hours were adjusted in this manner because there were no identified discrepancies between other Offerors' pricing narrative and price workbook.
>
> Although the cost evaluator adjusted [KFS's] labor hours, the Total Evaluated Price (TEP) remained unchanged. The adjustment in labor hours did not impact [KFS's] TEP, as it was based on the proposed price rather than labor hour calculation.

11

AR 2070. The Army further explained, in a supplemental declaration by the price evaluator, that while the labor hour modification "may have caused confusion between the proposal and the summarized Table [in the price evaluation report] . . . no changes from the Proposal were made to the number of FTEs, Rates or the Categories in that Table of Labor Mix and Hours." AR 2089.

Despite ATS's arguments to the contrary, the Court finds that the Army's error did not prejudice ATS. First, since the Army's error in adjusting KFS's labor hours did not impact KFS's proposed TEP, ATS has not demonstrated how the error prejudiced ATS during the Army's price evaluation. Regardless of the Army's error in its evaluation documentation, the Army evaluators and SSA used the correct TEPs for each offeror to conduct the price analysis and make a source selection decision. *See* AR 1170 (Price Analysis Table); AR 1227 (Evaluation Roll-Up Table). Because the price analysis was unaffected by the Army's error, there was no resulting prejudice to ATS in connection with the price evaluation.[9] Next, ATS has not shown how the error prejudiced it during the technical evaluation. The government acknowledges that the Army evaluators "reviewed each quoters' estimated labor and staffing plans," [ECF 42] at 26, and that, despite not explicitly discussing KFS's specific number of labor hours, the SSA "likely . . . based the [award] determination on the hours that included the administrative error," *id.* This is evident from the record where the erroneous labor hours are contained in the price evaluation report, AR 1171-72, and source selection memorandum, AR 1223. Regardless, this potential reliance does not adequately demonstrate prejudice to ATS because KFS's correct total proposed labor hours exceeded ATS's proposed labor hours, *see* AR 1172, 2069, and ATS and KFS each received a technical rating of "Good"—the highest rating, AR 1206-07. In other words, if the evaluators determined that ATS's lower proposed total labor hours were sufficient to achieve the highest rating, then it is logical to conclude that the evaluators also would have found KFS's higher proposed total labor hours sufficient to achieve the same rating. In sum, ATS has not shown that there was a substantial chance it would have received the award but for the Army's error. *See Alfa Laval Separation,* 175 F.3d at 1367.

### C. The Army's Technical Evaluation Was Rational

ATS argues that "the Army's technical evaluation was not conducted in accordance with the RFQ requirements and the decisions reached were not properly documented." [ECF 38] at 22. ATS also asserts that the Army "was to evaluate an offeror's proposed plan to fulfill the requirements specified in the PWS, noting its associated merits and risks . . . and evaluate the

---

[9] ATS argues that the Army should have changed KFS's TEP to account for the increased number of labor hours stemming from the Army's error. [ECF 38] at 21. According to ATS, "[n]ot changing the KFS price when the level of effort hours increase violates FAR 8.405-2(d)." *Id.* The Court is not persuaded by this argument. FAR 8.405-2(d) states that "[t]he ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable." Here, whether the Army considered KFS's level of effort to be ▇▇▇▇ based on the error or ▇▇▇▇ based on KFS's price proposal, KFS's proposed level of effort is still greater than ATS's proposed level of effort and both approaches received the highest technical ratings. *See* AR 1172, 2069; *see also* AR 1206-07. Furthermore, for the purposes of determining price reasonableness, the Army utilized KFS's correct proposed labor hours and TEP. *See* AR 1170, 1227. With respect to the mix of labor, KFS's approach was unimpacted by the error, and the SSA determined that both KFS and ATS "provided a superior staffing approach." AR 1232.

offeror's detailed staffing plan, noting its associated merits, with an emphasis on flexibility and efficiency." *Id*. ATS contends that the Army's technical evaluation summary of KFS's proposal does not support an award of three merits to KFS and that "each Merit is without any factual basis and is ultimately a fiction that was arbitrarily relied on to bootstrap KFS from what should have been an 'Acceptable' technical rating to a 'Good.'" *Id*. The government responds that "ATS's disagreement with [the Army's] evaluative judgments falls far short of meeting its heavy burden in challenging a best-value procurement." [ECF 42] at 28. The government argues that "ATS simply points to portions of KFS's proposal and offers its own opinion that the proposal was inadequate and did not deserve 'Merits.'" *Id.* at 29-30.

The Court finds that the Army's assignment of three merits to KFS's proposal was rational. "Effective contracting demands broad discretion." *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993) (collecting cases). Accordingly, "government agencies are entrusted with a good deal of discretion in making procurement decisions." *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1047 (Fed. Cir. 1994). "The court gives great deference to an agency's technical evaluation of an offeror's proposal." *N. S. Consulting Grp. v. United States*, 141 Fed. Cl. 549, 554 (2019) (citing *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 297 (2006), *overruled on other grounds sub. nom.*, *Sys. Stud. & Simulation, Inc.*, 22 F.4th 994 (Fed. Cir. 2021)). "This deference is heightened for cases involving highly technical subject matter." *Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 22 (2019) (citing *E.W. Bliss Co.*, 77 F.3d at 449). Therefore, "where an agency's decisions are highly technical in nature . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)). The Court's function is therefore limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa*, 238 F.3d at 1332-33 (quoting *Latecoere*, 19 F.3d at 1356).

The RFQ defines a merit as an approach "that provides the Government additional benefits that exceed the Government requirement." AR 389. The Army awarded KFS three merits in its technical evaluation. AR 1181. The Army assigned the first merit for KFS's "Staffing Plan in support of uninterrupted services to training units." *Id*. The Army recognized that "[a]lthough [KFS's] Staffing Solution includes ▮ [FTE] personnel annually, exceeding the Government provided Staffing Plan . . . [KFS] provides a more than adequate justification for its proposed labor types and overall staffing solution." *Id*. The Army justified the first merit by explaining that:

> [KFS]'s proposed Organizational Chart (Figure 2.2-1) . . . and the detailed narrative in its proposal, demonstrates to the Government that [KFS] fully understand[s] the requirement. [KFS's] technical approach enables the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to proactively address requirements and requests and to resolve problems in a timely manner as required. Additionally, [KFS's] staffing plan includes detailed information justifying the Labor Mapping, Functional Area of Responsibilities, and [KFS's] labor category, functional area of responsibility and its roles/responsibilities by PWS section, to provide the Government

13

> confidence that [KFS] fully understands the requirement, and provides a sound approach reducing the risk of unsuccessful contract performance.

AR 1181-82.

The Army assigned the second merit for KFS's "Technical approach to achieve all PWS performance tasks." AR 1181. The Army justified the second merit by explaining that:

> The Execution Approach . . . in [KFS's] proposal, includes detailed approaches pertaining to recruitment and retention goals, surge support (PWS 3.0), a transition plan (PWS 2.5.6.1) in section 3.2.1, and Phase in plan (PWS 2.5.6.1). [KFS's] proposal clearly addresses all PWS transition requirements and provides a sound approach to phase, reducing the risk of unsuccessful contract performance.

AR 1182.

The Army assigned the third merit for KFS's "Staffing approach by functional area." AR 1181. The Army justified the third merit by explaining that:

> The staffing approach by functional area in [KFS's] proposal . . . demonstrates an approach to meeting every performance requirement from the PWS section 3 tasks, to include mission understanding, functional area responsibilities, justification for labor mapping, and [KFS's] federal experience in task performance. Table 3.2-1 . . . details the priority sequencing and schedule of personnel onboarding. [KFS's] detailed staffing approach, identifying functional area responsibilities, demonstrating mission understanding, justifying labor mapping, as well as its extensive federal experience, provides the Government with confidence in the offerors ability to effectively transition into the new contract and provide stability throughout contract execution, reducing the risk of unsuccessful contract performance.

AR 1183.

Each merit awarded for KFS's "Staffing Plan," "Technical Approach," and "Staffing approach by functional area" culminated in a "reduc[tion] [of] the risk of unsuccessful contract performance." AR 1181-1183. For ATS to succeed in its challenge of the Army's assignment of merits to KFS, ATS would have the Court scrutinize the language of the Army's explanations. Yet, the Court finds no grounds to second guess the Army's evaluation of KFS's technical proposal or its assignment of merits. *See E.W. Bliss Co.*, 77 F.3d at 449. As shown above, the Army found that each of the approaches offered by KFS individually reduced the risk of non-performance and thereby warranted a "merit." A lower risk of non-performance reasonably justifies awarding a merit. Further, it was well within the Army's discretion to decide what

14

proposed approach reduced the risk of non-performance such that the Army would receive an additional benefit that warranted the assignment of a merit. *See Am. Relocation Connections, LLC v. United States*, 147 Fed. Cl. 608, 619 (2020) (stating that "[p]rocurement officials have significant discretion when evaluating offerors' technical capability, especially in a best-value procurement," and that the SSA "had the discretion—and duty—to analyze one offeror's superiority over another"); *McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 231 (2016) (stating that "the Court defers to the agency's exercise of its discretion to evaluate which strengths are most likely to lead to the achievement of the [agency's] objectives and outcomes"). Therefore, based on the record, the Court finds that the Army acted reasonably and in compliance with the RFQ when it assigned KFS three merits.[10]

## IV. CONCLUSION

Accordingly, ATS's MJAR [ECF 38] is **DENIED**, and the government's and KFS's respective cross-MJARs [ECFs 42, 44] are **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

On June 26, 2025, KFS filed a Motion to Complete the AR with a declaration from a KFS representative and a copy of KFS's original pricing workbook. [ECF 43] at 1. KFS subsequently filed an amended motion with an updated declaration. [ECF 45]. ATS did not oppose KFS's motions. Therefore, KFS's initial motion [ECF 43] is **DENIED AS MOOT**, and its amended motion [ECF 45] is **GRANTED**. Additionally, ATS's Motion for Leave to Exceed the Page Limit [ECF 47] and ATS's First Motion for Leave to File Out of Time [ECF 51] are **GRANTED**.

ATS requests that the Court enter a permanent injunction "to prohibit the [Army] from allowing the exercise of any further option years available under the subject contract" and requiring the Army to reevaluate the proposals for the subject contract. [ECF 41] at 95. When deciding if a permanent injunction is warranted, the Court considers whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed Cir. 2004)). Achieving success on the merits "is a necessary element for a permanent injunction." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999

---

[10] ATS argues that the Army's actions amounted to an unauthorized conversion of the procurement from a best-value procurement to a lowest-price, technically acceptable procurement. [ECF 38] at 35. This argument is unpersuasive because, in its evaluation, the Army eliminated the lowest-priced, technically acceptable offeror and instead selected KFS. AR 1227, 1232. ATS also argues that the Army "acted improperly by removing past performance requirements" from the RFQ. [ECF 38] at 35. This argument is waived under the *Blue & Gold* rule because the RFQ clearly stated that the evaluation factors were limited to technical and price, and an argument that past performance should have been an evaluation factor should have been raised before the close of the bid process. *See Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1378 (Fed. Cir. 2024) (applying the *Blue & Gold* rule where the protestor failed to raise a challenge to the solicitation terms before close of the bid process); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that challenges to a solicitation must be brought before the close of the bidding process).

(Fed. Cir. 2018). In this case, ATS has not succeeded on the merits. Therefore, ATS is not entitled to a permanent injunction.

Some information contained in this Opinion and Order may be considered protected information subject to the Protective Order, [ECF 19], entered on April 29, 2025. Accordingly, the Opinion and Order is **FILED UNDER SEAL**. The parties **SHALL CONFER** and **FILE, on or before August 29, 2025**, a joint status report that identifies any information that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge
